

IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>EDWARD LEE MOODY, JR. AND CM CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>G.E. HOLDINGS CORP.,<br><br>Relief Defendant. | Civil Action No. 3:18-cv-00442-JAG<br><br><u>UNDER SEAL</u> |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges the following against Defendants Edward Lee Moody, Jr. ("Moody") and CM Capital Management, LLC ("CM Capital") and Relief Defendant G.E. Holdings Corporation, ("G.E. Holdings"):

## SUMMARY OF THE ACTION

1. For nearly a decade, Moody, individually and through his wholly-owned investment adviser firm CM Capital, has operated a Ponzi scheme and defrauded dozens of investors.

2. From at least October 2009 to the present, defendants raised approximately $4.95 million from approximately 60 individuals and entities for investment purposes. However,

defendants did not invest that money on investors' behalf, as they had represented they would. Instead, Moody misappropriated nearly $2.26 million for his personal use, while paying out approximately $1.4 million to early investors. Another $1.2 million remains in accounts that Moody controls.

3. Using investor funds, Moody purchased a house, made car payments, dined, traveled, and shopped. He also invested $884,690 on his own behalf, at least $628,694 of which he subsequently lost.

4. To maintain the illusion of legitimacy, and to conceal the misuse of investor assets, Defendants provided false account statements to their clients. Those statements purport to show that Defendants' clients are profitably invested, when in fact their assets have either been dissipated or remain, uninvested, in bank accounts that Moody controls.

5. Defendants' misconduct is ongoing. They continue to collect investor funds, use them to pay off earlier investors, and divert them to their own use. They have obtained over $1.1 million from victims in 2018 alone, including more than $1 million from a single investor in February.

6. Through the activities alleged in this Complaint, Defendants have engaged in:

   a. fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder;

   b. fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"); and

   c. fraudulent conduct by an investment adviser, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

2

7. To maintain the *status quo* and preserve any remaining assets for defrauded investors before entry of a final judgment, the Commission seeks emergency equitable relief, including an order:

   a. temporarily freezing all assets currently in accounts controlled, directly or indirectly, by Defendants and Relief Defendant and otherwise maintaining the *status quo*;

   b. requiring Defendants and Relief Defendant to submit a sworn accounting of investor funds and all other assets in their possession, including Moody's use of investor assets for his personal benefit;

   c. preventing Defendants and Relief Defendants from destroying or altering relevant documents;

   d. authorizing expedited discovery; and

   e. directing Defendants and Relief Defendant to show cause why the requested asset freeze should not remain in place pending final resolution of this matter.

8. The Commission also seeks:

   a. entry of a permanent injunction prohibiting Defendants from further violations of the federal securities laws;

   b. entry of a preliminary injunction freezing assets of Defendants and Relief Defendant;

   c. disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest;

   d. disgorgement by the Relief Defendant of all unjust enrichment and/or ill-gotten gains received from Defendants, plus pre-judgment interest; and

e. imposition of civil penalties due to the egregious nature of Defendants' violations.

## JURISDICTION AND VENUE

9. The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. The Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

10. The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa], and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

11. Venue is proper in this district and division because Defendant Moody resides in this district and division. In addition, CM Capital and Relief Defendant G.E. Holdings from time to time used business addresses, and conducted business activity, in this district and division.

## DEFENDANTS

12. **CM Capital Management, LLC** is a Virginia Limited Liability Company and has been registered as an investment adviser with the state of Virginia since 1999. It is located in Virginia Beach, Virginia.

13. **Edward Lee Moody, Jr.**, age 47, is the founder, president, control person, and sole employee of CM Capital and G.E. Holdings. He was also the only investment adviser representative of CM Capital. Prior to starting CM Capital in approximately June 1999, Moody

4

was associated with two registered broker-dealers from 1997 to 1999, and held Series 6, 63, and 65 licenses. He is a resident of Chesterfield, Virginia.

## RELIEF DEFENDANT

14. **G.E. Holdings Corporation** is a Wyoming corporation incorporated by Moody on April 6, 2017. The company was administratively dissolved on June 8, 2018 for failure to pay required taxes. A previous incarnation of the company was incorporated by Moody and another individual on April 3, 2001. That company was also administratively dissolved on June 10, 2012 for failure to pay required taxes. Moody was the sole control person for G.E. Holdings from at least 2008 to the present. Accounts in the name of G.E. Holdings have been used to receive and transfer investor assets, and the accounts continue to hold investor funds.

## FACTUAL ALLEGATIONS

### A. Defendants Have Represented Themselves as Investment Advisers That Manage Client Assets for the Purpose of Investment

15. As a state-registered investment adviser since 1999, CM Capital regularly filed Forms ADV with the Virginia State Corporation Commission. A Form ADV is the form used by investment advisers to register with both the SEC and state securities authorities. Among other requirements, advisers must provide to their clients a brochure that describes their services, fees, potential conflicts, and the background of key personnel.

16. On August 21, 2017, CM Capital filed an updated Form ADV. In it, CM Capital claimed that it had "$3.04 million in client assets under management" and provided investment advisory services to "11-25 clients." CM Capital also reported that its clients paid an annual management fee ranging from 0.5% to 2% of assets under management.

17. In the August 21, 2017 Form ADV, CM Capital further claimed that it did not have custody of client assets.

5

18. In the brochure that accompanies its March 31, 2017 Form ADV, Moody is described as CM Capital's owner, "principal executive officer and management person." Moody is also described as a portfolio manager who conducts his own securities trading in "firm capital." The brochure claims that there will "not be a conflict of interest" between Moody's trading and the trading he does on behalf of CM Capital clients.

19. No other individuals are listed as having any role in connection with CM Capital.

20. Between 2009 and 2014, when he stopped charging management fees, Moody charged investors $112,847 in management fees, in addition to diverting approximately $2.26 million in investor assets to himself.

### B. By Misrepresenting Themselves as Investment Advisers That Would Profitably Invest Client Money, Defendants Obtained Millions of Dollars from Investors

21. Beginning in October of 2009 and continuing to the present, Moody and CM Capital solicited and obtained $4.95 million from nearly 60 victims located primarily in Virginia, Maryland and California.

22. Defendants employed various means to persuade clients to invest, all of which described Defendants as investment advisers who invested client assets in securities. In addition to filing a Form ADV to register publicly as an investment adviser, Defendants maintained a publicly available Facebook page describing their business as an "Investing Service."

23. They also solicited at least some investors using a "Private Wealth Management" brochure that described Moody's purported investment management business and the "investment process" he claimed to employ.

24. Further, at least 14 of Defendants' investors signed investment advisory agreements ("IMAs") with CM Capital. Under these agreements, advisory clients granted CM Capital the authority to buy and sell securities on their behalf. In exchange for investment

6

management services, clients agreed to pay an annual fee ranging from 2% for up to $50,000 in assets under management to 0.5% for assets under management over $2 million. Among other representations, CM Capital stated in the IMAs that it "will manage the account in accordance with the investment mandates of the Client." Moody signed the IMAs on behalf of CM Capital.

25. As such, and upon information and belief, Defendants solicited clients by promising that Defendants would profitably invest their assets in securities, and then manage those investments on an ongoing basis.

26. Nearly 60 investors provided funds to Defendants in primarily round, large-dollar amounts, by check, cash, credit card, PayPal and wire transfer. In at least 20 instances, notations such as "investment," "stock trading" or similar phrases on checks and wire transfers further reinforced that investors had been told that Defendants would invest and manage their money.

27. For example, on September 30, 2016, one client and victim wired $84,000 to CM Capital "for trading account managed by Ed Moody." Nearly a year later, on July 27, 2017, another victim wrote a check to G.E. Holding for $30,000 with "investment" written on the memo line.

28. At least 13 victims, many of whom were elderly, funded their investments with Defendants by liquidating assets from existing Individual Retirement Accounts ("IRAs").

29. The funds that Defendants solicited from investors were deposited into one of seven bank accounts held in the name of CM Capital or G.E. Holdings. Moody opened and controlled all seven accounts, at least four of which appear to have been used for his personal expenses.

## C. Defendants Used Investor Funds to Operate a Ponzi Scheme and for Moody's Sole Benefit

30.     Defendants did not invest any of the $4.95 million on behalf of investors. Instead, investor funds were used to keep Defendants' Ponzi scheme operating, to personally enrich Moody, and for investment on Moody's behalf.

31.     To maintain the appearance of a legitimate, profitable investment advisory business, Defendants used $1.4 million of the $4.95 million obtained from investors to pay off other, earlier investors.

32.     Moody also used approximately $1.84 million on personal expenses such as a house, car loan payments, restaurants, travel to Las Vegas and other destinations, and shopping. For example, on March 13, 2018, he transferred $364,235 to pay for the purchase of a home for himself. Withdrawals from other accounts, often in amounts as little as $1,000 at a time, show that Moody was diverting investor assets as far back as 2009. He also took an additional $418,769 through direct transfers to his personal bank accounts and cash withdrawals.

33.     Moody's only investment of the funds he solicited from investors was for his own potential benefit. Beginning in 2011 and continuing through 2018, Moody placed $851,950 in an account at TradeStation Securities, Inc. ("TradeStation") in the name of G.E. Holdings – with Moody listed as the only beneficiary. He placed another $32,740 in an account at AMP Global Securities, LLC ("AMP") in the name of CM Capital, again with Moody listed as the only beneficiary.

34.     Moody lost most of that money. As of May 31, 2018, he had incurred $628,694 in investment losses in his TradeStation account – nearly 70% of his original stake. His losses, largely the result of high-volume day-trading in futures and other derivatives, grew despite steady gains in the overall market.

35. Moody appears to have suffered similar losses in the account with AMP, with only $1,790 returned to the accounts that held investor funds.

36. Bank records reveal the workings of Defendants' fraudulent scheme. For example, on November 16, 2016, Moody had only $80 in G.E. Holdings account number -6013. On that day, an investor wired $400,000 to that account from an IRA. By July 2017, Moody dissipated over $226,590, using it to re-pay earlier investors, to fund his ongoing losses at TradeStation, and to pay for his personal expenses.

37. Between July 2017 and January 2018, four other investors put a total of $168,500 into the -6013 account. Moody continued to use those funds in the same manner: repayments to earlier investors, securities trading on his own behalf, and personal expenses. By April 30, 2018, there was only $11,510 left in -6013. None of the money was ever invested on behalf of Defendants' victims.

38. Moody's use of a $59,395 investment made by Investor A on December 19, 2017 further illustrates how Defendants operated their scheme. The wire transferring those investment funds to a G.E. Holdings account (numbered -1847) – which previously had an account balance of only $8 – carried a notation of "investment." Yet, the funds were never invested. Instead, between February 23, 2018 and April 16, 2018, Moody transferred $21,580 to an investor who previously gave Defendants $60,000 for "investment" purposes. Moody also spent another $19,922 on remodeling costs for his new home and transferred another $3,500 of the original investment amount to a personal bank account.

39. Defendants' repayments to investors created the impression that Defendants had made profitable investments, frequently leading investors to give Defendants additional funds.

40.     For example, in August 2011, a married couple ("Investors B/C") gave Defendants a total of $360,000, which Moody placed in G.E. Holdings account -9024. By January 31, 2012, Moody had misappropriated all but $39,831 of that investment. But on February 1, 2012, another investor wired $130,000 to the -9024 account. In June 2012 and periodically thereafter, Moody used the new investor's funds – and what was left of the Investors B/C assets – in that account to send partial repayments back to Investors B/C. Nine months after Moody began sending those repayments, beginning in March 2013, Investors B/C wired a total of another $65,173 to the -9024 account.

41.     Defendants have continued to obtain and misappropriate investor assets to perpetuate the Ponzi scheme. They have obtained over $1.1 million from investors in 2018 alone, including more than $1 million from a single investor in February. Beginning in February of this year, Moody has moved at least $42,000 in investor funds offshore through transfers to at least two international PayPal accounts in the names of unknown individuals. In addition, in April 2018, Moody used $125,631 of investor funds to make payments to existing investors, transferred $60,000 to his TradeStation account, took $8,668 for himself in the form of cash and transfers to his personal bank account, and otherwise spent $33,687.

### D. Defendants Falsely Told Their Clients That The Clients' Accounts Were Earning Substantial Investment Returns

42.     Defendants continued to solicit and obtain new investments from victims despite misappropriating investor money and earning no returns. They were able to continue this fraudulent conduct because they misled their victims about the true status of their investments.

43.     One means by which Defendants prevented investors from learning the truth was by providing them with falsified monthly account statements. For example, Defendants provided one advisory client ("Investor D") with falsified account statements after Investor D invested

10

$115,737 with Moody in October 2017. Investor D made his investments in two checks, which Moody deposited to a CM Capital bank account he controlled. "[I]nvestment for future" was written in the memo line of one of Investor D's checks.

44. Defendants sent at least four monthly account statements to Investor D. The statements purported to show the status of Investor D's investments during October 2017, November 2017, December 2017 and February 2018. Those statements falsely claimed that Investor D's funds had been invested in securities – largely securities of the company Roku, Inc. – and had earned returns of nearly $3,000.

45. In fact, Investor D's funds were the only funds in the CM Capital bank account. They were never invested and earned no interest or income.

46. After receiving the false December account statement, Investor D invested another $37,000 on February 8, 2018, via a check made out to CM Capital that was deposited to a CM Capital bank account.

47. Moody attempted to make the falsified account statements appear legitimate by modeling them after Scottrade's standard brokerage account statements. Moody replaced "Scottrade" with "G.E. Holdings." Moody and CM Capital included in the falsified account statements language that appeared in Scottrade's statements: "All products and services offered – Member FINRA/SIPC." The Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC") are self-regulatory organizations whose members are securities broker-dealers or individuals associated with broker-dealers. In fact, neither CM Capital nor G.E. Holdings was or ever had been a broker-dealer or a member of FINRA or SIPC.

48. Defendants similarly provided another client ("Investor E") with false account statements. CM Capital gave Investor E account statements purporting to show that the money she had invested with Defendants had been invested in securities held in three separate brokerage accounts. In fact, bank records reflect that her funds were never invested in any securities or even transferred to a brokerage account for potential investment on her benefit.

49. Specifically, on or about January 24, 2017, Investor E wrote a check for $100,000, payable to CM Capital. Moody deposited the check in a CM Capital bank account. Moody and CM Capital later sent Investor E an account statement that falsely reflected that her investment was maintained in a brokerage account with $33,346.51 invested in securities and $74,433.93 held in cash. Bank records show that, in reality, Investor E's $100,000 investment was transferred to Moody's personal bank accounts, used to repay existing investors, and spent by Moody. As of April 30, 2018, none of Investor E's money had been transferred to any brokerage account for potential investment.

50. Moody's ongoing deception of his current investors aided him in soliciting new investors. For example, in August of 2017, before Investor D invested, he informed Moody that he was reluctant to transfer money to Moody. Investor D stated that an assistant would contact other investors whose names Moody provided as references.

51. When Investor D's assistant contacted those references, they told her the following:

- Moody provides "monthly Statements" and "lets you decide at what pace you would like to take [your money out]."
- Moody is "honest and has made her a lot of money. Her investments are yielding 6% to 7%."

- "Last year [Moody] put some money in Apple and he made a lot of money."

52. After receiving this information, Investor D gave Moody $115,737 to invest in October of 2017.

53. In reality, Defendants never invested any of these investors' money and generated no investment income on their behalf.

### E. Defendants Knowingly and/or Recklessly Created, Perpetuated, and Profited From a Ponzi Scheme

54. Defendant's investment scheme bears the hallmarks of a Ponzi scheme. Defendants raised nearly $5 million through false statements and deceptive conduct. Then, contrary to Defendants' representations about their business, they failed to invest client money or produce any profits. Instead, Moody used the monies for his personal expenses and to pay off other investors. Any payments Defendants made to investors either came from new investor deposits or what little remained from initial client deposits.

55. Defendants knowingly or recklessly engaged in deceptive conduct and made material misstatements to investors.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Both Defendants)

56. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 55, as if they were fully set forth herein.

57. By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

58. By engaging in the foregoing misconduct, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Both Defendants)

59. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 55, as if they were fully set forth herein.

60. By engaging in the conduct above, Defendants, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) knowingly or recklessly employed devices, schemes or artifices to defraud;

(b) knowingly, recklessly or negligently obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchaser.

14

61. By engaging in the foregoing misconduct, Defendants violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Both Defendants)

62. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 55, as if they were fully set forth herein.

63. By engaging in the conduct described above, Defendants, directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce while acting as an investment adviser:

> (a) knowingly or recklessly employed devices, schemes, or artifices to defraud advisory clients or prospective advisory clients; and
>
> (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

64. By engaging in the foregoing conduct, Defendants violated and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against Relief Defendant G.E. Holdings Corp.)

65. The Commission realleges and incorporates by reference the allegations in Paragraphs 1 through 55, as if they were fully set forth herein.

66. Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

67. As described above, Relief Defendant received investor funds and assets that were the proceeds, or are traceable to the proceeds, of Defendants' unlawful activities, as alleged in paragraphs 1 through 55 above, and Relief Defendant has no legitimate claims to those proceeds and gave no consideration in exchange for receipt of those funds.

68. Relief Defendant obtained the funds and assets as part of and in furtherance of the securities violations alleged in paragraphs 1 through 55 above and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and assets. As a consequence, Relief Defendant was unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Enter a Final Judgment:

(a) finding that Defendants each violated the securities laws and rules promulgated thereunder as alleged against them herein;

(b) restraining and enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder;

(c) directing Defendants and Relief Defendant to disgorge all ill-gotten gains, including prejudgment interest, resulting from the violations alleged herein; and

(d) directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act.

## II.

Enter an Order freezing Defendants' and Relief Defendant's assets and accounts, including the accounts containing the victim assets described above.

## III.

Enter an Order directing Defendants and Relief Defendant to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees in writing or as otherwise ordered by the Court, a verified written accounting, signed by Moody on behalf of himself, CM Capital and G.E. Holdings.

## IV.

Enter an Order preventing Defendants and Relief Defendant from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents, books and records.

## V.

Enter an Order permitting expedited discovery.

## VI.

Enter an Order directing Defendants and Relief Defendant to show cause why the asset freeze should not remain in place pending final resolution of this matter.

Dated: June 27, 2018.                Respectfully submitted,

                                     /s/ Sarah Hall
                                     Sarah Hall (VSB No. 71084)
                                     U.S. Securities and Exchange Commission
                                     100 F Street NE
                                     Washington, DC 20549
                                     (202) 551-4784 (Hall)
                                     halls@sec.gov


Of Counsel:

Devon L. Staren (application for admission *pro hac vice* filed concurrently)
Daniel J. Maher (application for admission *pro hac vice* filed concurrently)
Nicholas C. Margida (application for admission *pro hac vice* filed concurrently)
U.S. Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549