

# IN UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

vs.

EDWARD LEE MOODY, JR. AND CM
CAPITAL MANAGEMENT, LLC,

        Defendants,

    and

G.E. HOLDINGS CORP.,

        Relief Defendant.

Civil Action No. 3:18-cv-00442-JAG

**UNDER SEAL**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER FREEZING ASSETS, ORDER TO SHOW CAUSE, AND OTHER EMERGENCY RELIEF

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................2

    I.  Defendants and Relief Defendant ...................................................................2

    II. The Scheme.......................................................................................... 3

        A. By Misrepresenting Themselves as Investment Advisers That Would Profitably Invest Client Money, Defendants Obtained Millions of Dollars from Investors.......... 3

        B. Defendants Made No Investments on Behalf of Investors But Instead Misappropriated Investor Funds to Benefit Moody ....................................................... 5

        C. Defendants Engaged in Deceptive Conduct to Conceal and Perpetuate their Ponzi Scheme......................................................................................... 6

        D. Defendants Engaged in Additional Deceptive Conduct and Lied to Investors to Prevent their Fraud from Being Discovered and to Obtain New Investments ............ 8

ARGUMENT .....................................................................................................10

I. AN ASSET FREEZE IS APPROPRIATE TO ENSURE THAT ASSETS WILL BE AVAILABLE TO COMPENSATE VICTIMS BECAUSE THE SEC HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS .........................................................10

    A. The SEC Is Likely to Succeed in Establishing that Defendants Have Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.......................... 12

        1.  The Defendants Engaged in Deceptive Conduct, Including Making Misrepresentations .............................................................................13

        2.  The Defendants' Misconduct and Misrepresentations Were Material ................ 14

        3.  The Defendants Acted With Scienter ................................................... 15

        4.  Defendants' Misconduct Was in Connection with the Purchase or Sale of a Security ..................................................................................... 16

        5.  Defendants Used the Instrumentalities of Interstate Commerce.......................... 17

    B. The SEC Is Likely to Succeed in Establishing that Defendants Violated Sections 206(1) and 206(2) of the Advisers Act ...........................................................18

    C. There is a Strong Likelihood that, Unless the Court Imposes an Asset Freeze, Defendants Will Dissipate Assets.................................................................. 20

II. THE COURT SHOULD ORDER DEFENDANTS AND RELIEF DEFENDANT TO PROVIDE ACCOUNTINGS.................................................................................20

III. EXPEDITED DISCOVERY, ALTERNATIVE MEANS OF SERVICE, AND A
   PROHIBITION AGAINST THE DESTRUCTION OR ALTERATION OF
   DOCUMENTS ARE NECESSARY TO PREPARE FOR A HEARING TO SHOW
   CAUSE..... ...........................................................................................................21

IV. ENTRY OF AN *EX PARTE* IS APPROPRIATE.……...........................................22

CONCLUSION.………...............................................................................................22

# TABLE OF AUTHORITIES

Page

**Cases**

*Bald Eagle Area S.D. v. Keystone Fin., Inc.*, 189 F.3d 321 (3d Cir. 1999). ..................................16

*CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2000) .........................................10

*Greenhouse v. MCG Capital Corp.*, 392 F. 3d 650 (4th Cir. 2004) ...............................................14

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) .........................................................................17

*In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010) .................................................................13

*In re Bernard Madoff Inv. Sec.'s LLC*, 773 F.3d 411 (2d Cir. 2014) ...........................................16

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...............................16-17

*Knurr v. Orbital ATK, Inc.*, 294 F. Supp. 3d 498 (E.D.Va. 2018) ..................................................16

*SEC v. Ahmed*, 123 F. Supp. 3d 301 (D. Conn. 2015) .....................................................................11

*SEC v. Anticevic*, No. 05-cv-6991, 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005). .......................21

*SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) .......................................................................11

*SEC v. Callahan*, No. 12-cv-1065, 2015 WL 10853927 (S.D.N.Y. Dec. 24, 2015) .....................11

*SEC v. Chiase*, No. 10-cv-5110, 2011 WL 6176209 (D.N.J. Dec. 12, 2011)................................15

*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ................................................. 14-15, 17

*SEC v. Cooper*, 142 F. Supp. 3d 302 (D.N.J. 2015) .......................................................................18

*SEC v. Dowdell*, No. CIV. A. 3:01CV116, 2002 WL 424595 (W.D. Va. March 14, 2002) .........11

*SEC v. Faulkner*, No. 3:16-cv-1735, 2017 WL 4238705 (N.D. Tex. Sept. 25, 2017)...................11

*SEC v. Gruss*, 859 F. Supp. 2d 653 (S.D.N.Y. 2012) .....................................................................18

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)............................................................19

*SEC v. Hansen*, No. 13-cv-1403, 2017 WL 1298022 (S.D.N.Y. March 31, 2017)......................18

*SEC v. Helms*, No. 13-cv-01036, 2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) .................13, 14

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) .............................................................................16

*SEC v. Householder*, No. 02-C-4128, 2002 WL 1466812 (N.D. Ill. July 8, 2002)......................18

*SEC v. Illarramendi*, 260 F. Supp. 3d 166 (D. Conn. 2017)...........................................................19

*SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272 (9th Cir. 1990).........................................20

*SEC v. JSG Capital Investments, LLC*, No. 16-cv-2814, 2017 WL 3579570
(N.D. Cal. June 30, 2017).........................................................................................15

*SEC v. Lion Capital Mgmt., LLC*, No. C12-5116, 2013 WL 5945081
(N.D. Cal. Nov. 1, 2013)...........................................................................................19

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ........................11, 20

*SEC v. Pirate Investor LLC*, 580 F. 3d 233 (4th Cir. 2009) ............................... 12-13, 16

*SEC v. Riel*, 282 F. Supp. 3d 499 (N.D.N.Y. 2017) ....................................................14

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012).............................................................15

*SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031, 2011 WL 887940
(E.D.N.Y. Mar. 14, 2011) ...................................................................................... 20-21

*SEC v. Staples*, 55 F. Supp. 3d 831 (D.S.C. 2014) ................................................ 12-13

*SEC v. Thibeault*, 80 F. Supp. 3d 288 (D. Mass. 2015)...............................................21

*SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275 (D. Utah 2017).....................13, 15

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)..........................................11, 12, 21

*SEC v. Woolf*, 835 F. Supp. 2d 111 (E.D. Va. 2011) ...................................................13

*SEC v. World Capital Market, Inc.*, 864 F.3d 996 (9th Cir. 2017).................................13

*SEC v. Zandford*, 535 U.S. 813 (2002)......................................................................17

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)....................................................10, 11, 12

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ................................19

*U.S. v. Kelley*, 551 F.3d 171 (2d Cir. 2009).......................................................... 15-16

*U. S. v. Setser*, 568 F.3d 482 (5th Cir. 2009) ....................................................... 13-14

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") respectfully submits this Memorandum of Law in Support of its Emergency *Ex Parte* Application for a Temporary Restraining Order Freezing Assets, an Order to Show Cause, and Other Emergency Relief, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commission respectfully requests that the Court grant its application in its entirety.

## PRELIMINARY STATEMENT

The Commission brings this emergency action to halt an ongoing Ponzi scheme and prevent further dissipation of investors' money. Beginning in October 2009 and continuing today, Defendants, Edward Lee Moody, Jr. ("Moody") and CM Capital Management, LLC ("CM Capital") (collectively, "Defendants") have solicited and obtained nearly $4.95 million from 60 investment advisory clients but have made *no* investments on their behalf. Instead, Moody has kept the investor assets in accounts he controls, and used the funds to pay for a house, cars, retail goods, food, and travel, and to trade on his own behalf. In total, he has diverted over $2.2 million for his own use. To perpetuate and conceal this misconduct, Defendants have used approximately $1.4 million of new investors' funds to re-pay earlier investors, while providing investors with fake account statements falsely representing that the funds have been profitably invested in securities.

Because Defendants' fraud is ongoing, emergency relief is necessary to prevent Defendants from further dissipating investor funds or moving them out of the jurisdiction of the Court, and to preserve the *status quo* to allow for potential disgorgement against Defendants and Relief Defendant. Accordingly, the Commission respectfully asks the Court to issue a Temporary Restraining Order, *ex parte*, immediately freezing the accounts of Defendants and Relief Defendant, granting the other emergency relief sought herein, and ordering Defendants

and Relief Defendant to show cause why the requested relief should not by extended via issuance of a preliminary injunction.

**STATEMENT OF FACTS**

## I.    <u>Defendants and Relief Defendant</u>

Edward Lee Moody, Jr. is the founder and sole control person for CM Capital Management, LLC and G.E. Holdings Corporation.  Prior to starting CM Capital in approximately June 1999, Moody was associated with two broker-dealer firms from 1997 to 1999, and held Series 6, 63, and 65 securities licenses.  *See* Declaration of Devon L. Staren dated June 26, 2018 ("Staren Decl.") ¶ 5, Exhibit ("Exh.") 1 thereto.

CM Capital Management, LLC is a Virginia Limited Liability Company and has been registered as an investment adviser with the state of Virginia since 1999.  *Id.* ¶ 6, Exhs. 2, 3, 4. CM Capital is wholly controlled by Moody, who is its only investment adviser representative. *Id.*  CM Capital filed its most recent Form ADV on August 21, 2017 and reported having provided, within the past year, investment advisory services to 11-25 clients with a total of $3,043,000 in assets under management for an annual management fee of 0.5% to 2% of assets under management.  *Id.*, Exh. 3.  CM Capital also maintains a publicly available Facebook account, in which it describes itself as an investment adviser and includes Moody's email address in its contact information.  *Id.*, Exhs. 5a-5f.  Accounts in the name of CM Capital have been used to receive and transfer investor assets.  *Id.* ¶ 6, *see also* Declaration of Jeffrey Anderson dated June 26, 2018 ("Anderson Decl.") ¶¶ 9-10, 13-14.

G.E. Holdings Corporation is a Wyoming corporation incorporated by Moody on April 6, 2017.  Staren Decl. ¶ 7, Exh. 6.  According to Wyoming business records, the company was administratively dissolved on June 8, 2018 for failure to pay required taxes.  *Id.*  A previous incarnation of the company was incorporated by Moody and another individual in 2001.  *Id.*,

2

Exh. 8.  Corporate filings with the state of Wyoming reflect that Moody was the sole control

person for G.E. Holdings from at least 2008 to the present.  *Id.*, Exhs. 8, 9.  Notwithstanding the

dissolution of G.E. Holdings, accounts in the name of G.E. Holdings have been used to receive

and transfer investor assets, and there are currently investor funds in those accounts.  Anderson

Decl. ¶¶ 11-12, 15, 20-22.

## II.    The Scheme

### B.  By Misrepresenting Themselves as Investment Advisers That Would Profitably Invest Client Money, Defendants Obtained Millions of Dollars from Investors.

Beginning in October 2009, Defendants solicited and obtained approximately $4.95

million from approximately 60 investors, located primarily in Virginia, Maryland, and

California.  Staren Decl. ¶ 13; Anderson Decl. ¶ 8.

Defendants employed various means to persuade clients to invest, all of which described

Defendants as investment advisers who invested client assets in securities.  For one, Defendants

have maintained a publicly available Facebook page describing their business as providing

"Investments and Professional Money Management Services."  Staren Decl. ¶ 6, Exhs. 5a-5f.  In

addition, in a March 31, 2017 firm brochure provided to at least some of its advisory clients, (*id.*

¶ 15, exh. 17), Defendants identified CM Capital as an "Advisory Firm", described the

"Advisory Services" it provides, and indicated that it had $3.04 million of client assets under

management.  *Id.* ¶ 6, Exh. 4 at 5.  The firm brochure is Part 2A of the Form ADV, which is a

form used by investment advisers to register with both the SEC and state securities authorities,

including the Virginia State Corporation Commission.  Among other representations in its March

31, 2017 brochure, CM Capital claimed, falsely, that it did not have custody of client assets (*exh.

4.* at 21, 23) and that it had a "Code of Ethics" that obligated CM Capital to put the interests of

3

its clients ahead of its own. *Id.* at 15. CM Capital made similar claims in its publicly available Form ADV. Staren Decl. ¶ 6, Exh. 3.

Defendants also solicited at least some investors using a "Private Wealth Management" brochure that described Moody's purported investment management business and the "investment process" he claimed to employ. Staren Decl. ¶ 15, Ex. 17. In addition, at least 14 of Defendants' investors signed investment management agreements ("IMAs") with CM Capital. *Id.* ¶¶ 8, 15, Exhs. 10, 16a-16f, 28, 37, 48. Under these agreements, advisory clients granted CM Capital the authority to buy and sell securities on their behalf. *Id.* In exchange for investment management services, those advisory clients agreed to pay an annual fee ranging from 0.5% to 2% of assets under management. *Id.* Between 2009 and 2014, Moody charged investors $103,392 in management fees. Staren Decl. ¶ 10; Anderson Decl. ¶ 7. Among other representations, CM Capital stated in the IMAs that it "will manage the account in accordance with the investment mandates of the Client." *See, e.g.*, Ex. 16a at ¶ 1. Moody signed the IMAs on behalf of CM Capital. *See, e.g.*, Exhs. 16a, 16b.

Defendants obtained money from investors based on their understanding that Defendants would invest the money for them. In at least 20 instances, investors specified on the check or wire that the funds were for "investment," "stock trading" or similar phrases. Staren Decl. ¶ 17, Exhs. 18, 19. For example, on September 30, 2016, one client and victim wired $84,000 to CM Capital "for trading account managed by Ed Moody." Exh. 18. Nearly a year later, on July 27, 2017, another victim wrote a check to G.E. Holding for $30,000 with "investment" written on the memo line. Exh. 19.

Those investment funds were provided to Defendants through various means, including cash, check, wire transfer, and accounts at PayPal Holdings, Inc., and Square, Inc. that allowed

Defendants to receive electronic transfers and credit card payments. Staren Decl. ¶ 13. At least 13 of the 60 investors transferred funds to the Defendants' and Relief Defendant's accounts by liquidating, at least partially, their self-directed individual retirement accounts ("IRAs") *Id.* ¶ 16. The funds that defendants solicited from investors were deposited into one of seven bank accounts held in the name of CM Capital or G.E. Holdings. *Id.* ¶ 13. Moody opened and controlled all seven accounts, at least four of which appear to have been used for his own personal expenses unrelated to the business of CM Capital or G.E. Holdings. Anderson Decl. ¶ 9-15, Anderson Exhibits ("Exhs.") 17-23 attached thereto.

### C. Defendants Made No Investments on Behalf of Investors But Instead Misappropriated Investor Funds to Benefit Moody.

Contrary to investors' understanding, Defendants did not invest any of the $4.95 million they obtained from investors. Instead, Moody misappropriated investor funds for personal expenses, and he transferred, and ultimately lost most of, additional investor funds to personal securities trading accounts.

Moody used nearly $1 million of investor funds on personal expenses, including a house, car loan payments, restaurants, travel, and shopping. Staren Decl. ¶ 14; Anderson Decl. ¶ 17-19. For example, on March 13, 2018, he used $364,235 of investor funds to purchase a new home for himself. Anderson Decl. ¶ 18. Financial records show that Moody has misappropriated investor assets as far back as 2009. *Id.* ¶ 9. In addition, he transferred or withdrew as cash another $418,769 of investor funds. *Id.* ¶ 17.

The only investment of the funds Defendants solicited from investors was for Moody's own potential benefit. From 2011 through 2018, Moody transferred $851,950 in investor funds to a trading account at TradeStation Securities, Inc. ("TradeStation") in the name of G.E. Holdings – for which Moody was listed as the sole beneficiary. Staren Decl. ¶ 20, Exh. 22;

Anderson Decl. ¶ 19. He put another $32,740 of investor money into an account at AMP Global Clearing, LLC ("AMP") in CM Capital's name – for which Moody was listed as the sole beneficiary. Staren Decl. ¶ 21, Exh. 23; Anderson Decl. ¶ 19. Moody lost most of the money that he sent to those two accounts and invested. Staren Decl. ¶ 22. As of May 31, 2018, he had lost $628,694 from the TradeStation account, due largely to high-volume day-trading in futures and other derivatives, at a time when the overall market was experiencing steady gains. Staren Decl. ¶ 22, Exhs. 24, 25. He suffered similar losses in the AMP account, with only $1,790 returned from that account to the accounts that held investor funds. Staren Decl. ¶ 23, Exh. 26.

### D. Defendants Engaged in Deceptive Conduct to Conceal and Perpetuate their Ponzi Scheme.

To maintain the appearance of a legitimate, profitable investment advisory business, Defendants used approximately $1.4 million of the nearly $4.95 million solicited from investors to pay off other, earlier investors. Staren Decl. ¶ 14; Anderson Decl. ¶ 17. What's more, Defendants made these Ponzi payments to earlier investors as a means to get those earlier investors to reinvest with Defendants, thereby perpetuating Defendants' scheme.

As detailed in the attached Declarations and exhibits thereto, bank records reveal the workings of Defendants' fraudulent scheme, in particular how Moody, while simultaneously enriching himself, used new investor money to pay earlier investors and continue the scheme. For example, on November 16, 2016, Moody had only $80 in G.E. Holdings account number -6013. Anderson Decl. ¶ 20. On that day, an investor wired $400,000 to that account from an IRA. *Id.* By July 2017, Moody had dissipated over $225,000, using it to re-pay earlier investors, to fund his personal securities trading, and to pay for personal expenses. *Id.* ¶ 21. Between July 2017 and January 2018, four other investors put a total of $168,500 into the -6013 account. *Id.* ¶ 22. Moody continued to use those funds in the same manner: repayments to earlier investors,

6

trading on his own behalf, and personal expenses. *Id.* ¶ 21-22. By April 30, 2018, there was only $11,510 left in account -6013. *Id.* ¶ 22.

There are numerous similar examples. In December 2017, Investor A wired $59,395 for "investment" to a G.E. Holdings account with a balance of $8.00. Staren Decl. ¶ 18. That money sat in the account, un-invested, until February 23, 2018, when Moody began spending it. Staren Decl. ¶ 18. Between February 23, 2018 and April 16, 2018, no new or other funds were deposited into that G.E. Holdings account. *Id.* ¶ 19. Not one dollar was invested. *Id.* Instead, Moody paid nearly $38,000 to earlier investors and others, including a check for $21,580 to an investor who previously gave Defendants $60,000 for "investment" purposes. *Id.*, Exh. 21. Moody spent another $19,922 of the funds in the G.E. Holdings account on a renovation of his home, and he also transferred another $3,500 to a personal bank account. *Id.*

Defendants' repayments to investors created the false impression that Defendants had made profitable investments, frequently leading investors to give Defendants additional funds. For example, in August 2011, a married couple ("Investors B/C") gave Defendants a total of $360,000, which Moody placed in G.E. Holdings account -9024. *Id.* ¶ 24-25, Exh. 27. By January 31, 2012, Moody had dissipated all but $39,831 of that investment. *Id.* ¶ 25. But on February 1, 2012, another investor wired $126,000 to the -9024 account. *Id.* ¶ 25, Exhs. 31-33. In June 2012 and periodically thereafter, Moody used the new investor's funds and what was left of the Investors B/C assets in that account to make repayments to Investors B/C. *Id.* ¶ 26, Exh. 34. Nine months later, Investors B/ C invested with Defendants again, ultimately wiring another $65,173 to the -9024 account. *Id.* ¶ 26, Exh. 35.

### E. Defendants Engaged in Additional Deceptive Conduct and Lied to Investors to Prevent their Fraud from Being Discovered and to Obtain New Investments.

In addition to making the Ponzi payments described above, Defendants engaged in other deceptive conduct to make sure investors did not learn the true status of their investments. The primary means by which Defendants accomplished this was by sending investors fake account statements. For example, Defendants provided one advisory client ("Investor D") with falsified account statements after Investor D invested $115,737 with Moody in October 2017. Staren Decl. ¶ 29-30, Exhs. 39-43. Investor D made his investments in two checks, which Moody deposited to a CM Capital bank account he controlled. "[I]nvestment for future" was written in the memo line of one of Investor D's checks. *Id.* ¶ 29, Exh. 39. Defendants sent at least four monthly account statements to Investor D that purported to show the status of Investor D's investments during October 2017, November 2017, December 2017, and February 2018. *Id.* ¶ 30, Exhs. 40-43. Those statements falsely claimed that Investor D's funds had been invested in shares of Roku, Inc. and had earned returns of nearly $3,000. *Id.*, Exhs. 40-43. In fact, Investor D's funds were the only funds in the CM Capital bank account. *Id.* ¶ 32, Exh. 45. They were never invested and earned no interest or income. *Id.* After receiving the false December account statement, Investor D invested another $37,000 on February 8, 2018, via a check made out to CM Capital that was deposited to a different CM Capital bank account. *Id.* ¶ 31, Exh. 44.

To make these fake account statements appear legitimate, Defendants modeled them after Scottrade's standard brokerage account statements. But he replaced "Scottrade" with "G.E. Holdings." *Id.* ¶ 38, Exh. 53. Defendants included in the fake statements language that appeared in Scottrade's statements: "All products and services offered – Member FINRA/SIPC." *Id.*, Exh. 53. In fact, neither CM Capital nor G.E. Holdings was or ever had been a broker-dealer or a member of FINRA or SIPC.

Defendants similarly provided another client ("Investor E") with false account statements, purporting to show that the money she had invested with Defendants had been invested in securities held in three separate brokerage accounts. Staren Decl. ¶¶ 33, 35, Exh. 50. However, bank records reflect that her funds were never invested in any securities or even transferred to a brokerage account for potential investment for her benefit. *Id.* ¶¶ 34, 36, Exhs. 36, 49a, 49b. On or about January 24, 2017, Investor E wrote a check for $100,000 payable to CM Capital, which Moody deposited in a CM Capital bank account. *Id.* ¶ 36, Exh. 51. Later, CM Capital provided Investor E with an account statement falsely reflecting that her investment was being held in a brokerage account in the form of $33,346 worth of securities and $74,433 in cash. *Id.* ¶ 36, Exh. 52. In fact, bank records show that her $100,000 investment was transferred to Moody's personal bank accounts, used to repay existing investors, and otherwise spent by Moody. *Id.* ¶ 37. As of April 30, 2018, none of Investor E's money had ever been transferred to any brokerage account for potential investment. *Id.*

Not only did Moody's ongoing deception enable him to conceal his scheme and get prior investors to invest again, it also aided him in soliciting new investors. Investor D, discussed above, is one example. In August of 2017, before investing, Investor D informed Moody that he was reluctant to invest with Moody. Exh. 54. Investor D stated that an assistant would contact other investors, whose names Moody provided as references. Exhs. 54, 55. When Investor D's assistant contacted those references, they told her the following:

- Moody provides "monthly Statements" and "lets you decide at what pace you would like to take [your money out]."
- Moody is "honest and has made her a lot of money. Her investments are yielding 6% to 7%."
- "Last year [Moody] put some money in Apple and he made a lot of money."

Exh. 56. In reality, Defendants never invested any of these investors' money nor did they generate any real investment income on their behalf. After receiving this information, Investor D invested $115,737 in October of 2017. Staren Decl. ¶ 29, Exh. 39.

Defendants have continued to collect investor assets to perpetuate the Ponzi scheme. They have obtained at least $1.1 million from victims in 2018 alone, including more than $1 million from a single investor in February. Anderson Decl. ¶ 15. Moody has continued to dissipate investor assets through at least April 2018, the last month for which the Commission has records. For instance, in April 2018 alone, Moody used $125,631of investor funds to make payments to existing investors, transferred $60,000 to TradeStation, took $8,668 for himself in the form of cash and transfers to his personal bank account, and simply spent $33,687. Anderson Decl. ¶ 24. As of April 30, 2018, approximately $1.2 million still remains in the seven G.E. Holdings and CM Capital accounts. *Id.* ¶ 25.

## ARGUMENT

To preserve the *status quo* and protect defrauded investors from further harm via the continued dissipation of investor funds, the Court should enter an order freezing the assets of Defendants and Relief Defendant and granting the other relief requested, including expedited discovery.

I.     **AN ASSET FREEZE IS APPROPRIATE TO ENSURE THAT ASSETS WILL BE AVAILABLE TO COMPENSATE VICTIMS BECAUSE THE SEC HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

Federal courts have "inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 193 (4th Cir. 2000) (quotation and citation omitted); *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (stating that Courts, upon appropriate showing, have

"plenary power[]" to freeze assets of defendants and others in enforcement actions). An asset

freeze prevents the dissipation of assets. *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir.

1990) (an asset freeze "simply assures that any funds that may become due can be collected");

*SEC v. Ahmed*, 123 F. Supp. 3d 301, 308 (D. Conn. 2015) (An asset freeze "serves to preserve

the status quo and to ensure that, in the event the SEC obtains a judgment, money will be

available to satisfy that judgment.") (quotation and citation omitted). In so doing, a freeze

ensures that securities fraud victims may ultimately be compensated. *SEC v. Manor Nursing

Centers, Inc.*, 458 F.2d 1082, 1105-06 (2d Cir. 1972).[1]

Courts may extend the asset freeze to relief defendants who have received ill-gotten

funds to which they do not have a legitimate claim. *Smith*, 653 F.3d at128 (2d Cir. 2011)

(citation omitted); *Ahmed*, 123 F. Supp. 3d at 307-14 (setting forth the basis for freezing assets of

relief defendants). Additionally, in Commission enforcement actions, a court may freeze assets

sufficient to satisfy an award not only of disgorgement, but also of prejudgment interest and a

civil monetary penalty. *See SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)

(prejudgment interest); *Unifund*, 910 F.2d at 1042 (civil penalty); *Ahmed*, 123 F. Supp. 3d at

312-13 (freezing relief defendant assets sufficient to pay a penalty); *SEC v. Faulkner*, No. 3:16-

cv-1735, 2017 WL 4238705, *4 (N.D. Tex. Sept. 25, 2017) (freezing assets of defendant and

entities controlled by defendant in amount sufficient for disgorgement and penalty). Finally, to

preserve assets sufficient for a defendant's maximum liability, the Court may freeze assets even

if they are not traceable to the fraudulent conduct. *SEC v. Callahan*, No. 12-cv-1065, 2015 WL

10853927, *2 (S.D.N.Y. Dec. 24, 2015) (citations omitted).

---

[1] Consistent with the goal of ultimately compensating investors, courts in this Circuit and
elsewhere routinely order asset freezes in cases involving Ponzi schemes. *See, e.g., SEC v.
Ahmed*, 123 F. Supp. 3d 301 (D. Conn. 2015); *SEC v. Dowdell*, No. CIV. A. 3:01CV116, 2002
WL 424595, *15 (W.D. Va. March 14, 2002).

To obtain an asset freeze, "the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith*, 653 F.3d at 128 (quotation and citation omitted). The SEC need not establish a "likelihood of future violations." *Unifund*, 910 F.2d at 1041 (explaining that an asset freeze requires a lesser showing than a preliminary injunction against violations of the securities laws, "the freeze order does not place [defendants] at risk of contempt in all future securities transactions").[2]

The Commission has alleged that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Section 206 of the Advisers Act.

**A.** **The SEC Is Likely to Succeed in Establishing that Defendants Have Violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act**

An asset freeze is appropriate because the SEC has established at least an inference that Defendants have violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act. "Courts apply nearly identical tests for determining liability under Section 17(a), Section 10(b), and Rule 10b–5. To establish a violation under these anti-fraud provisions, the SEC must prove that a defendant: (1) made a material false statement or material omission or engaged in deceptive conduct, (2) in connection with the offer, sale, or purchase of a security, (3) by means of interstate commerce." *SEC v. Staples*, 55 F. Supp. 3d 831, 837 (D.S.C. 2014) (citing *SEC v. Pirate Investor LLC*, 580 F. 3d 233, 239 (4th Cir. 2009); other authority omitted). The SEC must show defendants' scienter "to prove a violation of Section 17(a)(1), Section 10(b), and Rule 10b–5, while Sections 17(a)(2) and (3) are proven by showing a defendant acted negligently." *Id.* at

---

[2] Although not required for an asset freeze, the SEC will show below that, because Defendants continue to operate their Ponzi scheme, there is a strong likelihood of future violations.

837-38 (citations omitted). To meet its burden on scienter, the SEC must show that the deceptive conduct or misrepresentations was intentional or reckless. *SEC v. Woolf*, 835 F. Supp. 2d 111, 119 (E.D. Va. 2011) (citing *Pirate Investor*, 580 F. 3d at 241).

### 1. The Defendants Engaged in Deceptive Conduct, Including Making Misrepresentations

For purposes of the antifraud provisions of the securities laws, operating a Ponzi scheme is *per se* deceptive. *See, e.g., SEC v. Helms*, No. 13-cv-01036, 2015 WL 5010298, *13 (W.D. Tex. Aug. 21, 2015) (operating a Ponzi scheme "is, by definition, a 'fraudulent scheme'") (citation omitted); *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1299 (D. Utah 2017) ("A Ponzi scheme is inherently deceptive because it generates a false appearance of profitability by using money from new investors to generate returns for earlier investors.") (citation omitted); *In re Bayou Group, LLC*, 439 B.R. 284, 307 (S.D.N.Y. 2010) (same, collecting 2nd and 9th Circuit authority). Because the evidence shows that is precisely what Defendants did here, the SEC is overwhelmingly likely to prevail on the merits.

As one district court recently summarized, "the central characteristic of a Ponzi scheme is that returns are not based upon any underlying business activity. Instead, money from new investors is used to pay earlier investors." *Traffic Monsoon, LLC*, 245 F. Supp. 3d at1298 (reviewing 10th Circuit authority); *see also SEC v. World Capital Market, Inc.*, 864 F.3d 996, 1000 n.1 (9th Cir. 2017) (noting that the SEC's definition of a Ponzi scheme is "an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors"). This is precisely what Defendants did here. The SEC has established that Defendants did not actually invest victim assets. There was no underlying business activity to generate returns. Instead, they used proceeds from new investors to pay returns to prior investors, which is the definition of a Ponzi scheme. *U. S. v. Setser*, 568 F.3d 482, 486 (5th Cir. 2009)

("As in a classic Ponzi scheme, as new investments came in . . . some of the new money was used to pay earlier investors.").

Defendants also employed misrepresentations in furtherance of their scheme. Through their Form ADV, a Facebook page, brochures describing their business, and IMAs, Defendants created the false impression that they would invest their clients' money in securities. In addition, Defendants provided victims with blatantly false account statements purporting to show that their money was profitably invested. In fact, it was not; instead, it was used for Moody's personal expenses, used to repay earlier investors, and invested on Moody's behalf.

### 2. The Defendants' Misconduct and Misrepresentations Were Material

Defendants Ponzi scheme and accompanying misrepresentations created false appearances of fact that were indisputably material. "A fact is material is there is a substantial likelihood that the disclosure of the fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Greenhouse v. MCG Capital Corp.*, 392 F. 3d 650, 656 (4th Cir. 2004) (discussing Supreme Court precedent). As Courts have uniformly concluded, it would be important to any reasonable investor to know that, instead of being invested, his or her money was being used to run a Ponzi scheme and pay Moody's personal expenses. *See, e.g., SEC v. Riel*, 282 F. Supp. 3d 499, 520 (N.D.N.Y. 2017) (as a matter of law, "[n]o reasonable investor would have invested with REinvest had he or she known that REinvest did not invest in real estate or any other business, that Defendant Riel and REinvest did not intend to invest most of the funds for a return, or that Defendant Riel would use most of the investment funds for personal expenses"); *see also, e.g., Helms,* 2015 WL 5010298 at *14 (the undisclosed use of investor funds to prevent the collapse of, and to perpetuate, the Ponzi scheme was material); *SEC v. Constantin*, 939 F. Supp. 2d 288, 307 (S.D.N.Y. 2013)

(misrepresentations in account statements and diversion or misappropriation of investors assets are material as a matter of law) (collecting authority); *SEC v. Chiase*, No. 10-cv-5110, 2011 WL 6176209, *4 (D.N.J. Dec. 12, 2011) ("These statements and omissions were material as a matter of law because any investor would obviously want to know that his financial advisor was misappropriating the investor's funds.").

### 3. The Defendants Acted With Scienter

Defendants' scienter is obvious from their active participation in the operation of the fraudulent scheme. "The operation of a Ponzi scheme itself is evidence of scienter." *Traffic Monsoon*, 245 F. Supp. 3d at 1302. Here, Moody had exclusive control of investor assets, which he used to fund his lifestyle and perpetuate Defendants' scheme. He knew that he had not invested the money Defendants obtained from investors as they had been led to believe he would. As the person with exclusive control over the accounts into which investor funds were deposited, Moody also knew that he had, in fact, used investors' money to enrich himself and pay off earlier investors. *See, e.g., SEC v. JSG Capital Investments, LLC*, No. 16-cv-2814, 2017 WL 3579570, *5 (N.D. Cal. June 30, 2017) (diversion of investor proceeds to personal use and "Ponzi-like payments to earlier investors . . . strongly supports an inference of scienter"); *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) (holding that where a defendant did not use investors' funds in the manner that he said he would, used some funds for his own personal expenses, "and provided false accountings," the "circumstances go beyond mere recklessness and indicate a deliberate intent to defraud investors").

It also follows from Moody's knowledge of how he had actually spent investors' funds that he knew that the account statements he provided to victims – representing that their money was invested in securities and earning returns – were also false. *See, e.g., U.S. v. Kelley*, 551

F.3d 171, 176 (2d Cir. 2009) (affirming conviction because false "account statements also indicate that Kelley's actions in defrauding his clients were not simple mistakes but were instead part of a larger, intentional scheme to defraud") (citing *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) ("A scheme to defraud may well include later efforts to avoid detection of the fraud.")).

Finally, as its controlling officer, Moody's scienter can be attributed to CM Capital. *Knurr v. Orbital ATK, Inc.*, 294 F. Supp. 3d 498, 513-514 (E.D.Va. 2018) (discussing multi-circuit authority).

### 4. Defendants' Misconduct Was in Connection with the Purchase or Sale of a Security

Defendants' fraud was in connection with the offer and sale of securities for purposes of the Commission's Section 17(a) claim and the purchase and sale of securities for purposes of Section 10(b). "Under Supreme Court case law, fraudulent activity meets the 'in connection with' requirement of § 10(b) whenever it touches or coincides with a securities transaction." *Pirate Investor*, 580 F.3d at 244-45 (listing factors relevant to deciding whether a transaction is "in connection with" and noting that the "application of the factors should be rooted in the understanding that the 'in connection with' requirement is a flexible one") (quotations and citations omitted). The "in connection with" requirement is interpreted expansively by courts. *Id.* at 244; *see also In re Bernard Madoff Inv. Sec.'s LLC*, 773 F.3d 411, 420 n. 3 (2d Cir. 2014).

In particular, "conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities." *Bald Eagle Area S.D. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999). That is true even where the defendants, purporting to act as investment advisers or brokers, do not actually invest victims' money in securities. *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361-63 (S.D.N.Y.

2011) (in case arising from Madoff fraud, the court reviewed multi-jurisdictional authority and concluded that the "in connection with" requirement may be met where the victims "part with money intending that it be invested in securities, only to have the person to whom that money is entrusted steal it"); *see also Grippo v. Perazzo*, 357 F.3d 1218, 1220-24 (11th Cir. 2004) (applying *SEC v. Zandford*, 535 U.S. 813 (2002) and finding the misconduct was in connection with even where "no proof exists that a security was actually bought or sold")); *Constantin*, 939 F. Supp. 2d at 305 (conduct satisfied "in connection with" even where no securities were purchased because "clients were motivated by a desire to invest their funds for a profitable return and were led to reasonably believe that they had . . .").

In this case, the evidence shows that Defendants' victims believed they were providing Defendants with funds for the purpose of investing for a profitable return. Specifically, in Form ADV's and on the internet, Defendants portrayed themselves as advisers that invested client assets in securities. They also entered into IMAs with many investors. Client check memos and wire notations – along with the fact that many invested assets came from IRAs – confirms that clients believed they gave Defendants' money for the purpose of investing in securities. Defendants reinforced this impression by providing account statements that falsely portrayed investments in securities that earned returns. Accordingly, because investors gave Defendants money for the purpose of investing it, Defendants' fraud is in connection with the offer, sale, and purchase of securities.

### 5. Defendants Used the Instrumentalities of Interstate Commerce

The evidence shows that Defendants used wires, mails, the internet and emails to perpetrate their fraudulent scheme, including soliciting and obtaining assets from victims located in states other than Virginia. The SEC has therefore satisfied the "interstate commerce"

requirement. *See, e.g., SEC v. Cooper*, 142 F. Supp. 3d 302, 315 (D.N.J. 2015) (use of "wire transfers, the internet, email, and the telephone" satisfied "interstate commerce" requirement).

## B. The SEC Is Likely to Succeed in Establishing that Defendants Violated Sections 206(1) and 206(2) of the Advisers Act.

Defendants' violations of the Advisers Act provide an independent basis for the Court to impose the asset freeze the SEC requests. "The elements of Sections 206(1) and (2) are similar to the elements of a claim under Rule 10b-5 such that facts showing a violation of Sections 10(b) or 17(a) by an investment adviser will also support a showing of a Section 206 violation." *SEC v. Hansen*, No. 13-cv-1403, 2017 WL 1298022, *6 (S.D.N.Y. March 31, 2017) (quotation and citations omitted). However, unlike Sections 17(a) and 10(b), Section 206 does not require the offer, purchase or sale of a security. *SEC v. Householder*, No. 02-C-4128, 2002 WL 1466812, *6 (N.D. Ill. July 8, 2002) (Explaining that Section 206 is "similar to, though broader than, Sections 17(a) . . . and Section 10(b)," as Section 206 "prohibit[s] investment advisers from . . . engaging in *any* transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client") (emphasis in original) (citation omitted).

In contrast to claims under 206(1), "[c]laims arising under Section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence." *SEC v. Gruss*, 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) (citations omitted).

CM Capital is a Virginia-registered investment adviser. In addition, Moody is CM Capital's owner, principal executive officer, and management person, and has held himself out as being in the business, for compensation, of making investment decisions for CM Capital clients. *See* Section 202(a)(11) ("Investment Adviser" is defined as "any person who, for compensation, engages in the business of advising others . . . . as to the advisability of investing in, purchasing, or selling securities.") Both Defendants are therefore "investment advisers" and may be held

18

primarily liable under Section 206 of the Advisers Act. *See, e.g., SEC v. Haligiannis*, 470 F. Supp. 2d 373, 378-79, 383 (S.D.N.Y. 2007) (CEO and President of investment adviser firm who made all investment decisions for the firm held to be an investment adviser himself).

As investment advisers, Defendants had a fiduciary duty to disclose material information to their clients. "Section 206 of the Advisers Act 'establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *SEC v. Illarramendi*, 260 F. Supp. 3d 166, 176 (D. Conn. 2017) (quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979)).

Defendants violated the Advisers Act by breaching their fiduciary duties and defrauding their advisory clients. Among other things, Defendants knowingly, recklessly, and negligently solicited investments from clients by representing that those funds would be invested and then used at least $2.2 million of those funds for Moody's personal benefit and another $1.4 million for payments to earlier investors. Defendants also knowingly, recklessly, and negligently sent false account statements to advisory clients, falsely representing that the clients' assets were invested in securities, when, in fact, the funds had never been invested. This operated as a fraud and was a breach of Defendants' fiduciary duties to those clients. *See, e.g., SEC v. Lion Capital Mgmt., LLC*, No. C12-5116, 2013 WL 5945081, *2 (N.D. Cal. Nov. 1, 2013) (entering judgment under Section 206 against defendant who created false account statements and "us[ed] client funds for personal and business expenses"). As a result, the Commission has made a sufficient showing that it is likely to succeed at trial on its Section 206(1) and Section 206(2) claims, and it has at least established an inference that Defendants violated those provisions of the Advisers Act.

C. **There Is a Strong Likelihood that, Unless the Court Imposes an Asset Freeze, Defendants Will Dissipate Assets**

As noted above, emergency action is necessary in this case to ensure that Defendants' victims may ultimately be compensated and to halt Defendants' lengthy ongoing fraud. In 2018 thus far, Defendants have continued to obtain and spend investor assets. Anderson Decl. ¶¶ 15, 24. At this time, however, over a million dollars in investor assets remains in the accounts the Commission seeks to have frozen. Id. ¶ 25. That money appears to be the means by which Moody finances his lifestyle. If an asset freeze is not imposed, Moody is likely either to dissipate that money or move it beyond the Court's jurisdiction.

As set out above and in the attached Declarations and exhibits thereto, the Commission has demonstrated it is likely to succeed on the merits or that, at minimum, an inference can be drawn that Defendants violated the antifraud provisions of the securities laws and that Defendants will likely dissipate assets that should be available to compensate victims. The Court should therefore enter an asset freeze.

II. **THE COURT SHOULD ORDER DEFENDANTS AND RELIEF DEFENDANT TO PROVIDE ACCOUNTINGS.**

The Commission further requests that the Court order Defendants and Relief Defendant to prepare and provide an accounting of, among other things, all investor funds received since October 2009, the disposition of those funds, and current location of all such funds and assets purchased with such monies, as well as all funds and assets held in the names or for the benefit of Defendants and Relief Defendant. Courts have the power to order accountings in Commission actions to determine the amount of investor funds and assets obtained, held, and diverted. *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *Manor Nursing Centers*, 458 F.2d at 1105; *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031, 2011 WL 887940, at *18

(E.D.N.Y. Mar. 14, 2011). An accounting is a necessary and appropriate aid to identify the location of investor funds and ensure that no other assets are dissipated.

## III. EXPEDITED DISCOVERY, ALTERNATIVE MEANS OF SERVICE, AND A PROHIBITION AGAINST THE DESTRUCTION OR ALTERATION OF DOCUMENTS ARE NECESSARY TO PREPARE FOR A HEARING TO SHOW CAUSE

The Commission also requests that the Court set this matter for a hearing to show cause prior to the expiration of the temporary asset freeze. To allow it to prepare for that hearing, the Commission requests that the Court order expedited document and deposition discovery under Federal Rules of Civil Procedure 26, 30, 31, 33, 34, 36, and 45, and Local Rules 26, 37, and 45. Courts may order expedited discovery in Commission emergency actions. *See, e.g., SEC v. Thibeault*, 80 F. Supp. 3d 288, 295 (D. Mass. 2015) (allowing expedited discovery in light of "the urgency of this matter"). Expedited discovery will enable the Commission to present a more complete evidentiary record to the Court, and may allow discovery of additional investor funds and therefore maximize the effectiveness of the requested asset freeze.

Lastly, the Commission asks that the Court order a prohibition against the destruction or alteration of any electronic or hard copy documents related to the allegations in the Complaint or to the assets, finances, or business operations of the Defendants and Relief Defendant. Such "innocuous" orders are routinely granted to protect the integrity of litigation. *See, e.g., Unifund*, 910 F.2d at 1040 n.11; *SEC v. Anticevic*, No. 05-cv-6991, 2005 WL 1939946, at *3-4 (S.D.N.Y. Aug. 5, 2005). This prohibition should impose no hardship on the Defendants and Relief Defendant and will help ensure that a full record of this matter can be developed through discovery and at any subsequent hearing or trial.

## IV. ENTRY OF AN ORDER *EX PARTE* ORDER IS APPROPRIATE

Under Federal Rule of Civil Procedure 65(b), an *ex parte* order may be entered if (1) it appears from specific facts shown by affidavit that immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition; and (2) the applicant's attorney certifies the reasons supporting the claim that notice should not be required. As explained in the Certification of Sarah M. Hall, which is attached, the Commission is concerned that if the Defendants or Relief Defendant become aware of this action before the asset freezes are instituted, they will move or further dissipate their assets. Hall Decl. ¶ 11. Accordingly, *ex parte* relief is necessary to prevent the Defendants and Relief Defendant from dissipating funds and assets.

## CONCLUSION

For the reasons stated above, the Commission respectfully this Court enter an order freezing Defendants' and Relief Defendant's assets, requiring Defendants and Relief Defendant to provide accountings, allowing expedited discovery and alternative means of service, prohibiting the destruction of evidence and granting any other emergency relief that is appropriate.

Dated: June 27, 2018.

Respectfully submitted,

Sarah Hall (VSB No. 71084)
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4784 (Hall)
halls@sec.gov

22

Of Counsel:

Devon L. Staren (motion for admission *pro hac vice* filed concurrently)
Daniel J. Maher (motion for admission *pro hac vice* filed concurrently)
Nicholas C. Margida (motion for admission *pro hac vice* filed concurrently)
U.S. Securities and Exchange Commission
100 F. Street NE
Washington, DC 20549

*Attorneys for Plaintiff*
*Securities and Exchange Commission*